510011. Counsel, please. Thank you. May it please the court, counsel, my name is Greg Kellner and I'm here on behalf of Olin Corporation. The issue in this case is relatively concise and relatively simple. Mr. Pullman had a serious injury to his left hand as he was working as an adjuster to at Olin. As a result of that injury, he could not return to his regular job. He went out on his own and found a job. We're well familiar with the facts. What's this straightforward issue? The straightforward issue is that the overtime that was included in the calculation of the 8D1 award, 4.5 hours, shouldn't have been included. Why isn't consolidated parole controlling on this? Because in this particular instance, there is evidence that from the only witness to testify with regard to the availability of overtime, that that overtime was not going to be available within about a four week period after the date of the trial. If you look at the evidence that was submitted by the petitioner, Petitioner's Exhibit 5, it was a scheduling matrix that showed that for the week of May, in May 2008, there were six 12 hour slots that were going to be covered by, and that would be overtime, would be covered by 12 adjusters. Five months later, the same scheduling matrix that was entered for the week of September 1st, 2008, showed that there were three slots that would be covered by six adjusters, and at the time of the hearing, William Hall, the department superintendent, testified that he only had two adjusters covering the combined shift, and that's consistent with what Hall testified, that he had received a mandate from management to reduce the overtime that was going to be available, and the point of all this is that it's also consistent with his testimony that within four weeks from the date of the hearing, there wasn't going to be any overtime that was going to be available to those people that were in the adjuster-to position. What if, by analogy, we had someone say, hey, we're going to move our Mossville Caterpillar factory to North Carolina in half a year, what happens to the claimant then? Well, I think the difference is that the statement that that's going to happen is less concrete than what we have here in terms of the actual evidence that was then introduced into evidence. What you can look at is evidence between May of 2008 and September 30th of 2008 when the case was tried, and what you can see from that is this isn't some hypothetical statement that we're going to reduce the overtime, in fact, the matter is, the evidence clearly shows that that overtime was in the process of being reduced, and in fact, had been reduced to the point that there were only two people that were covering the overtime shifts at the time that the case was tried. So the distinction I would make would be, and the reason I think the Commission's decision was an error here, was because you have evidence, and the only evidence that you have is that that overtime is not going to be available, and that therefore, based on that, the Commission's award of that 4.58 hours of extra overtime, on top of the 40 hours that we conceded that would be appropriate in calculating the 8D1 award, was speculative. Well, let's go to another one, let's take another one. Let's say we had a labor contract that was being negotiated and the wage rate was going to be reduced, and we have your claimant under a wage contract of higher wages, and the new contract is 3 weeks. What happens then? What do we do? Well, I mean, I think you're left with the same result. I mean, the issue is, what's the difference between what this man can earn pre-injury, if he's working full capacity in his pre-injury job, versus what he's able to make thereafter? And the crucial point in time is, you know, where are we at the time of the trial? And at the time of the trial here, and in your case, we know what he is making. We also know that in 3 weeks' time, in your hypothetical, that there's going to be a reduction in earnings. I don't think you can ignore that. Just like in my situation here, you can't ignore the fact that there's going to be, that he's not going to have overtime available. So we should then calculate on the lower wage rate, right? In my case? Yeah, I think so. Well, I mean, if the objective is to compensate him for the wage loss, you're not operating, I'll put it this way, you're not operating in a vacuum. In other words, if the situation here was that we know that he would work 40 hours a week, there was evidence that he would work the overtime, and there was no evidence that the overtime was being reduced and was going to come to an end within a 4-week period, then I don't think I'd be standing here making this same argument to you. But the fact of the matter is, you do have that evidence available to you, and I don't think you can ignore it. Well, let's turn that around for a second. You're arguing that speculation and conjecture give him this 4.5 hours for an indefinite period of time. Isn't it speculation and conjecture on your part to say at some point, the overtime is going to come to an end? What is the evidence in the record established when it was going to come to an end for Mr. Coleman? Bill Hall's testimony that it was going to come to an end. The study said it would likely accrue a similar amount for at least a year. Did Hall give a definitive time when it was coming to an end? He said within 4 weeks the overtime was going to be eliminated across the board. Based on what? Based on the mandate that he had been given from management and also based on the historical trend that showed the overtime that was available in Petitioner's Exhibit No. 5 from May to September the 1st, and then the difference between September the 1st and the hearing date when Hall said, now I've only got two people covering this overtime, whereas before I had 12. I had six shifts, then I went to three, and now I'm down to two. So what is the rule you would advocate? A specific time frame? What is the rule then that would determine cutoff point for the wage differential, the overtime? What's the rule? Well, I don't know if you can say there's a hard and fast rule, but I think you have to look at the evidence that you're presented, and in this case the only evidence that the Commission had was testimony from a management employee and evidence that was submitted by the petitioner that showed that what the management employee was saying about the way the overtime was going to be reduced is exactly what transpired here. So there's no reason to assume that Hall's testimony about the total limitation of overtime in approximately a four-week period after the hearing date is anything but accurate. And I know that in the petitioner's brief he says that Hall's testimony was self-serving, and if that were the case, if Hall's only reason to testify was self-serving, he certainly could have testified that Mr. Pullman wouldn't have had any  He didn't say that. He also didn't say that absolutely there would never be any overtime available to him between that period of March and September. He did allow the possibility that given Pullman's seniority there may have been some opportunities for overtime during that period, in fact, beyond the 4.5 hour. I'm quoting here from the arbitrator's findings. Hall testified that it would be impossible to project what, if any, overtime would be available to the petitioner or others in six months, a year, or further into the future. Yeah, that was How certain? Is that an accurate That is, in fact So how certain was his testimony that there would never be any overtime if he said, you know, I can't say it's impossible for me to project what, if any, or whether you'll get any or not? That quote that the arbitrator took was actually taken out of context and I'll explain why that's the case. Because I'm the one that asked the question after Mr. Hall had testified on direct examination regarding the elimination of overtime. And the point of my question was, is there any way, because the claim was going to be I knew that there was 4.5 hours of overtime that the petitioner wanted to have rolled into the AP1 calculation. And my whole point in asking the question was, you can't say that there's ever going to be any overtime available to him. And that's the response. His response is what you just read. His testimony was based upon a management decision that had been made. Yes. Do you agree that that management decision could change in a year and go the other way? You don't have any evidence that that would be the case. The only evidence you have is We don't have any evidence it wouldn't be either. I mean, certainly there's a history of providing overtime. And for me to try to tell you that absolutely and positively it could never change, I'm not going to suggest that to you. Because I think we all know that that could change. Wage differentials are provided for in Section 8 of the Act, are they not? Yes. Section 10 of the Act says the basis for computing the compensation provided in Section 7 and 8 of the Act shall be as follows. There is nothing about reducing this for what might happen in the future. Every one of the methods for computation under Section 10 is based upon the date of injury. You're asking us to adopt the method of computation that's not provided for in the Act. No, what I'm asking, Your Honor, is to look at the evidence that was presented. And the evidence presented was this overtime is not going to be available. If there was no evidence that that overtime was being eliminated, either by virtue of testimony or by the documentary evidence that was submitted by the Under the cases, the only question that we have determined was, was the overtime for which he was compensated mandatory when it was earned? And if the answer to that question is yes, it was mandatory, it's computed under one of the three methods provided for in Section 10. Judge, you raise an interesting point, and I was going to get to this in a moment, regarding the overtime issue. After the parties had submitted their briefs in this case and the time for me to submit a reply brief had expired, this Court issued the decision in which, since the case came out after the briefs were filed, that case is not cited in my brief. And when I was updating my research yesterday, I came across this case. I faxed Mr. Ho for a copy of it yesterday afternoon. And so I realized this is a little bit unusual. But with the Court's permission, and since you raised the overtime question, I thought... It's not unusual. You're supposed to file a motion to cite additional court. Well, as I said, I discovered it yesterday when I was updating my research. When did it come out? June the 22nd. But I think the Copperweld case actually addresses the very issue at hand here, because there was a petitioner who was similar situated to our man here, couldn't go back to work. He brought in evidence that a co-worker who had the same pay grade, same job, was making about $78,000 a year. And as it turned out, a component of that $78,000... You do not cite that in your... You're saying you have a motion to... I'd make an oral motion today, Your Honor, based on my discovery of this case yesterday. If the Court would prefer that I submit something in writing, that's fine. Or if I don't have the authorization to mention it this morning, I won't go any further. Did you inform your opponent? I did. I faxed him a copy of it yesterday afternoon, shortly after I discovered it. May I proceed? Please do. In brief, the Copperweld case, I think, addresses the question that Judge Hoffman just raised. And the question is whether the overtime is... Copperweld case said if it's mandatory, it's included. If it's voluntary, it's not. And in Copperweld, they couldn't tell if it was mandatory or not. In our case, the evidence from Mr. Hall is that if you're the senior employee and you want to take the overtime, you can. If you don't want to take it, you don't have to. And it's ultimately, I guess, mandatory on somebody because somebody's going to end up working it. But if you're the senior employee, you don't have to take it. We don't have any evidence on where Mr. Pullman fell in terms of the seniority roster of adjusters who might take the overtime or might not take it. And it's really unclear, in fact, it's totally unclear from the evidence, as to whether that 4.58 hours of overtime that's been included in the 8D1 calculation actually constitutes overtime that would be mandatory or whether it's overtime that would be voluntary on Mr. Pullman. It's not would be. It's was. It's not would be. It was. I'll restate myself then. If we assume that that 4.58 hours is going to get included or should be considered, there's no evidence that that 4.58 hours that's been included in the 8D1 calculation was mandatory or voluntary. You can't tell from the evidence that's been submitted. And I'd submit to you that that's another reason why the commission's decision was against the manifest way of the evidence. Where in the act did you find the requirement of mandatory? It's discussed in the Copperweld case. Not there? Well, that's true, but where in the act? I don't think the act makes a distinction about saying mandatory versus voluntary. That's a distinction that certainly this court has recognized in the Copperweld case and in other cases as well. But if Justice Hoffman's statement is it's not there in the language mandatory, it's just in our decision of law at this point? I'm not aware of anything that specifically says that makes a distinction. If your question for me is, is there something in the act that makes a distinction specifically between mandatory and voluntary, that's not in there that I'm aware of. Okay, thank you. Thank you. Counsel, please. May it please the court, opposing counsel, my name is Joe Holford. I represent Mr. Pullman in this case. I would like to correct opposing counsel, first of all, regarding one thing he said in argument just now. He indicated that Mr. Hall testified that in approximately four weeks there would be no overtime afforded adjuster twos. That's not what Mr. Hall said. If you'll refer to page 35 of the transcript, question, is it fair to state from this point forward, is it fair to say that there will be adjusters twos that will be surely working at least 4.8 hours of overtime a week? Answer, there will be adjuster twos. Question, and whether or not Mr. Pullman would have that opportunity, he may or he may not have, it just depends on seniority, and whether or not the senior people wanted that overtime, is that correct? Answer, that's correct. So Mr. Hall did not testify that there will be no overtime for adjusters four weeks after the hearing. The facts of this case are very simple. In the one year prior to the date of the accident, this guy worked at least 4.58 hours of overtime. In the six months before the date of hearing. Was it mandatory or voluntary overtime? Pardon me? Mandatory or voluntary? It is not indicated whether or not it's mandatory or voluntary. However, Justice, you referred to Section 10 of the Act, and Section 10 of the Act does apply in this case, and Section 10 of the Act says that that overtime is to be excluded unless it is part of a set number of hours consistently worked each week. And our cases have indicated that set number of hours meant mandatory overtime, not like the guy elected to do it. Our cases have always said mandatory versus voluntary. Correct. So you're telling me there is absolutely no evidence in this record as to whether it was mandatory or voluntary? There was no evidence in the record whether or not it was mandatory or voluntary. I would submit to you that overtime is to be included if it's mandatory or if it's regular. And as a matter of fact, the case cited by opposing counsel, the copper weld tubing case, it says that. It says that overtime is to be included if it's mandatory or if it's regular. Let's look in this case, was it regular overtime? One year before the accident, he worked at least 4.58 hours of overtime a week. Six months before the hearing, he would have worked at least 4.58 hours of overtime a week. It can be inferred that from the date of this guy's accident until he found suitable alternate employment in March of 2008, he would have worked at least 4.58 hours of overtime a week because Mr. Hall didn't testify to the contrary. Is it the manner in which we computed or do we compute it based upon the mandatory or regularly worked overtime prior to the date of accident under Section 10? Well, I think you have to look at what he made before the date of accident, after the date of accident, and that gives the commission an idea how much overtime this guy would be working. And in this scenario, we have proven that from December of 2004 through September of 2008, this gentleman would have worked at least 4.58 hours of overtime a week. Okay, what do we have to establish regularity of this overtime up to and including the date of accident? How long did he get the 4.58 hours? If you'll refer to Respondent's Exhibit No. 1, it shows the computation of the wages this fellow earned in the 52 weeks prior to the date of the accident. And you will note that in that 52-week period, this gentleman worked $3,996.88 he earned in straight-time overtime in that 51-week period, actually. You'll note that his straight-time earnings in that 51-week period are $30,960.00. If you divide that by 51, that means that his average weekly wage of that 51-week period was $607.07 a week. If you divide that figure by 40 hours a week, that shows that on the average, the one year prior to the date of the accident, this guy made on the average $15.18 a week. Getting back to what I said previously, if you take the $3,996.88 in straight-time overtime earnings that he made in the one year prior to the date of the accident, and you divide that by $15.18 an hour, that would indicate that in that one year period, Justice Holdredge, he worked an average of 5.16 hours a week in the one year preceded to the date of the accident. Wait a minute, that doesn't establish that his overtime was regular. I'm sorry? It has to be mandatory or regular. I mean, under your theory, all overtime would be included, because the only thing you're doing is taking his regular time plus his overtime and dividing it by 52 and saying he's averaging X number of dollars of overtime a week. That's not the computation under Section 10. It has to be regular work. Now, if a guy works four weeks at 70 hours a week, and then works the rest of the year with no overtime at all, based on your computation, we're going to include those 70 hours of overtime in the computation of his average weekly wage, and that's not the case. No, it's not the case, but under Section 10 of the Act, you're going to include the overtime if it's regular. So how do I know it's regular? Because we have proven that in a period of three years and eight months, namely from December of 2004 through September of 2008, this guy would have worked at least 4.58 hours of overtime a week. No, he would have averaged 4.58 hours of overtime a week. You didn't prove that he regularly worked 4.58 hours of overtime a week, and that's entirely different. He could have worked 20 hours in one week and nothing in the next three. And it could have all been voluntary. If we have proved that he has worked at least 4.58 hours of overtime a week for a period of three years and eight months. Hold on, hold on. You and I are not communicating. You have proved that he averaged that. You didn't prove that he worked it every week. Average is different than what you work every week. That is correct. All right, let's just make the equation simple. Take 10 weeks. If in the first five of those weeks a person works 60 hours and in the last five of those weeks he works 40 hours, by your computation you're going to turn around and say he averages, what, 50 hours a week. But he didn't regularly work 50 hours a week, did he? Well, if you look at the pay records showing the pay that he received and the overtime he worked in the one year preceding to the date of the accident, you're going to see that he worked overtime almost every week. How else are you going to be able to come up with a figure other than averaging it? Because there's no employer that's going to say, okay, you're going to work two hours of overtime every day for the next 3.8 years. It doesn't work that way. There are contractors that have to work X number of overtime every week as part of their engagement. They have to work 50 hours a week. In the record here, to get back to the point, in the record there is documentary evidence showing a week-by-week of working overtime. Is that what you're saying? In the one year preceding to the date of the accident, yes, sir. And then is Hall testifying that this individual worked overtime on a regular basis or can it be reasonably inferred that he did by the testimony of Hall? He said that from the time my fellow took an alternate suitable employment in March of 2008 up through the date of hearing, September 30th of 2008, my client would have worked at least 4.58 hours of overtime per week on the average. Okay. So just to clarify, in other words, make sure we got the semantics correctly or the language correctly, but you're saying that, yes, the 4.5 was admittedly an average, but in reality there's evidence in the record that he worked some overtime on a regular weekly basis. Correct. Is that a first statement? Correct. And that would be the records in the one year preceding to the date of the accident. And if you look at the consolidated coal case, in consolidated coal the petition was allowed to use his overtime hours. He said that he would work Saturdays into the future. And his supervisor acknowledged that he worked Saturdays when scheduled and that, quote, on a yearly basis claim it would probably work more than 40 hours a week. In that case, they said that the overtime hours would be used in the computation of the 8D2 award. In this case, the evidence is much stronger. The evidence is that for a period of three years and eight months, this guy would have worked at least 4.58 hours of overtime a week. We don't believe that the commission's decision is against the manifest way of the evidence. We respectfully request that this court uphold the decision. Thank you. Thank you. I just simply want to respond to counsel's opening comment about Mr. Hall's testimony. I draw you over to page 17 of the transcript where Hall was being asked about the petitioner's exhibit number 5, which were the scheduling matrix. And the quote is, Well, let me ask you this, sir, is it fair to state that from 5-12-08 to the current date, which would have been September the 30th, these schedules with reference to the 12-hour shifts fairly well represent the amount of hours that an adjuster of two has been required to work since May through the current date. And Hall's response is, no, they don't, because the current date there's only two individuals that's working 12-hour shifts at present time today, and by the next four weeks there will be no individuals working 12-hour shifts in that area. And then over on page 20, the same sort of dialogue takes place when Mr. Hall is being questioned again by the petitioner's attorney where he's asked, Mr. Hall, you indicated in about four weeks there's no longer going to be this overtime available for adjuster of twos in that department, is that correct? And the answer is, that's right. So there is testimony from Mr. Hall regarding the lack of overtime after the hearing date. Thank you. Thank you, counsel. The court will take the matter under advisory.